IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

IRINA CAMPBELL,

       Plaintiff,

vs.                                                                                                                      No.  02cv1384 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Campbell's) Motion to Reverse or Remand Administrative Agency Procedure **[Doc. No. 11]**, filed October 31, 2003, and fully briefed on December 29, 2003. On May 29, 2002, the Commissioner of Social Security issued a final decision denying Campbell's claim for disability insurance benefits. Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Campbell, now fifty-seven years old, filed her application for disability insurance benefits on May 11, 2000 (Tr. 73), alleging disability since November 30, 1978, due to mitochondrial cytopathy,[1] resulting in debilitating fatigue, primary immune deficiency, muscle myopathy[2] with

---

[1] Cytopathy is any disorder of a cell or anomaly of any of its constituents. *Stedman's Medical Dictionary* 438 (26th ed. 1995).

[2] Myopathy is any abnormal condition or disease of the muscular tissues; mitochondrial myopathy is a genetic condition in which there is weakness and hypotonia of muscles. *Stedman's Medical Dictionary* 1170 (26th ed. 1995).

muscle spasms and severe muscle pain.  Tr. 77.  Although more than one administrative hearing was scheduled, Campbell was unable to attend.  Thus, the Commissioner's Administrative Law Judge (ALJ) ruled on the record submitted.  On May 29, 2002, the ALJ denied benefits, finding Campbell "ha[d] a medically determinable impairment that [was] severe within the meaning of the Regulations" but her "impairments [did] not meet the applicable listings in the Listing of Impairments found in Appendix I, Subpart P, Regulations No. 4."  Tr. 15.  The ALJ further found Campbell retained the residual functional capacity (RFC) for "sedentary exertional level work through her date last insured, December 1984."  Tr. 18.  As to her credibility, the ALJ found Campbell was not a fully credible witness.  Tr. 19.

Campbell filed a Request for Review of the decision by the Appeals Council.  On September 13, 2002, the Appeals Council denied Campbell's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Campbell seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of

impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Campbell makes the following arguments: (1) the ALJ failed to obtain the opinion of a medical expert in finding she did not meet or equal a Listing; (2) the ALJ erroneously substituted his opinion for a medical expert's opinion; and (3) the ALJ erroneously assessed her ability to perform sustained employment and her past relevant work.

## A.  Failure to Develop the Record

Campbell contends the ALJ had the duty to fully develop the record and failed in this duty when he did not obtain the opinion of a medical expert before finding she did not meet or equal a listing.  Pl.'s Mem. in Supp. of Mot. to Reverse or Remand at 5.  According to Campbell, the medical evidence in her case is very technical and only a medical expert could render an opinion whether her impairment met or equaled a listing.  *Id.*

The Court recognizes that "[a]lthough a claimant has the burden of providing medical evidence proving disability, the ALJ has a basic duty of inquiry to fully and  fairly develop the record as to material issues." *Baca v. Dep't of Health and Human Servs.,* 5 F.3d 476, 479-80 (10th Cir. 1993).  "This duty exists even when the claimant is represented by counsel." *Id.*

In his decision, the ALJ found:

The claimant alleges complete disability due to medically determinable impairments secondary to toxic syndrome or a pharmacogenetic trait associated with a functional

>depression of immune T-cells (Exhibit 35F), and due to deteriorating mitochondrial function (CPT-1 deficiency).
>
>Exhibit 14F is a laboratory report dated December 9, 1977 by D. Howell, M.D. Though the report was not interpreted, it showed elevated 'lymphs.' Exhibit 15F is a report of blood gas and pH testing by Steven M. Zimmet, M.D., dated May 15, 1978 that showed low normal oxygen level despite hyperventilation. And, a thyroid panel dated May 16, 1978 by Dr. Liszka indicated that the claimant had begun treatment for hypothyroidism (Exhibit 16F).
>
>Exhibit 17F is a one-page treatment note. The portion of the note dated February 9, 1981 shows that the claimant was complaining of excessive phlegm and decreased breathing capacity. she was taking antibiotics and prednisone inhaler, which seemed to help the claimant's symptoms. A chest x-ray that was reportedly taken in January 1981 was 'Ok.' The claimant continued treatment for hypothyroidism. On March 5, 1981, the claimant had a 'cold.' Rheumatology examination had been negative, and the claimant requested allergy testing. The final entry found at Exhibit 17F was made April 5, 1989, more than 4 years after the claimant's date last insured.
>
>The above represents the whole of the objective medical record found in the file dated before the claimant's date last insured of December 1984. The balance of the medical file is documentation of clinical testing and treatment dated after November 26, 1985 (Exhibit 19F, page 2). While the medical file does document a severe impairment, there is not (sic) objective medical evidence that documents severe restrictions on the claimant's ability to do work-related activities prior to December 1984.

Tr. 14-15. Thus, the ALJ found Campbell had a severe impairment but found no objective medical evidence supporting disability prior to December 1984. In fact, the ALJ considered consulting with a medical expert regarding her residual functional capacity (RFC) but declined do so because he concluded the medical expert "testimony would represent the expert's opinion based on [Campbell's] subjective assertions." Tr. 16. The ALJ opined, "It is not at issue whether Ms. Campbell had the alleged disorder during the time period in question, from the alleged onset date to the date last insured. Since deteriorating mitochondrial function is defined as a congenital condition, and Ms. Campbell has the condition, it can be assumed that she had it during the period November 1977 to December 1984." Tr. 17. The ALJ concluded, "the primary issue considered in this analysis is the date that Ms. Campbell developed impairments so severe that she could no

longer tolerate work activities on a regular and continuing basis, at even the sedentary level of exertion." *Id.*

The ALJ is correct that the operative question is not whether Campbell suffered from mitochondrial cytopathy for the time period in question but whether she experienced functional limitations due to her impairment severe enough to preclude substantial gainful activity during that time period.  42 U.S.C. § 423(d)(2)(A); *see also Gardner-Renfro v. Apfel*, No. 00-6077, 2000 WL 1846220, at **3 (10th Cir. Dec. 18, 2000)("Regardless of whether plaintiff could have been diagnosed with a particular medical condition, none of the consultative physicians found her to have functional impairments which precluded the performance of all work during the relevant period.").  Ultimately, the ALJ found Campbell "retained the residual functional capacity for sedentary exertional level work through her date last insured, December 1984."  Tr. 18.  This finding is not supported by substantial evidence.

## B.  RFC Determination

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for **sustained** performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c)(emphasis added).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's <u>ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record</u>."  *Id.* (emphasis added).  The ALJ must also explain

how "any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.*

Additionally, substantial work activity is work that is both substantial, i.e., involving "significant physical or mental activities" even if done part-time or if the claimant does less, gets paid less, or has less responsibility than when he/she worked before; and gainful, i.e., "work usually done for pay or profit whether or not a profit is realized." 20 C.F.R. § 404.1572(a), (b). For a self-employed individual, "[s]upervisory, managerial, advisory or other significant personal services" he or she performs may show that individual is "able to do substantial gainful activity." 20 C.F.R. § 404.1573(d).

The records indicates Campbell worked as a bilingual secretary from October 1, 1975 until February 13, 1978. Tr. 78. In completing her Disability Report– Adult, Campbell noted:

> During 1976, while still working at the International Monetary Fund, I was experiencing more and more respiratory infections, which were getting more frequent, severe and weakening– and taking progressively longer for recuperation. Because my immunodeficiency also involved low leukocytes and lymphocyte count which failed to rise with infections, my diagnosis was overlooked by the physicians involved. As time progressed, I was more and more frequently having to work sick, and eventually I became too sick to work. After being absent from my work because of my illness, and unable to get a diagnosis, I wrote a letter to my employer, the International Monetary Fund, requesting that I be permitted to work on a part-time basis, to the extent I was able, while I continued to search for a diagnosis and treatment. I also offered in the letter that I would accept leave without pay until I could feel able to return to the office. I felt forced to offer that if these arrangements could not be made, I would have to resign since the fund had been insisting on an immediate statement of diagnosis and prognosis which were not available. I was fearful of being terminated and did not know my rights in the situation. Actually, fund policy included eligibility for disability in case of accident or illness once the 6-month probation had passed and I had been accepted as a permanent employee. My offer was rejected and I received a reply which did not address the issue and simply accepted my resignation with one month's severance pay. My illness continued to progress and the only work I have had since was part-time for approximately 3 hours per day– one

>day per week during 1984-1985 time frame and again 1 ½ hours per day– one day per week during the 1986-1988 time-frame.

Tr. 84-85. Campbell's statement is corroborated by her earning statement. Tr. 64. In 1976, Campbell earned $12,442.00, in 1977 she earned 12,909.00, in 1978 she earned $2,677.00, in 1979 and 1980 she had no earnings, in 1981 she earned $742.50, in 1982 she earned $36.00, in 1983 she had no earnings, in 1984 she earned $859.00, and from 1985 through 2001, the earning statement indicates no earnings. Tr. 64-65. Significantly, an agency employee noted on a SSA Use Only form, "Claimant's SE (self-employed) services was less than SGA (substantial gainful activity) level in 1979 to 1988." Tr. 93. In his decision, the ALJ also found "[C]laimant has not engaged in substantial gainful activity since her alleged onset date (November 30, 1978).

However, the ALJ found Campbell had not met her burden of objective clinical proof of a medically determinable impairment that existed prior to her date last insured. Tr. 16. Later in his decision, however, the ALJ conceded that "[s]ince deteriorating mitochondrial function is defined as a congenital condition, and Ms.Campbell has the condition, it can be assumed that she had it during the period November 1977 to December 1984." Tr. 17. Moreover, "negative test results or the absence of an objective medical test to diagnose a condition cannot support a conclusion that [a] claimant does not suffer from a potentially disabling condition." *Lantow v. Chater,* No. 95-5262, 1996 WL 576012, at \*\*1 (10th Cir. Oct. 8, 1996). Notwithstanding, the ALJ discounted Campbell's statements of disability during the time period in question on the grounds that (1) her activities subsequent to her alleged date of onset belie[d] the total inability to do work (Tr. 16); (2) Dr. Sollins (Campbell's physician) did not speculate on exactly when she may have become severely impaired by her condition (Tr. 15); and all physicians' references to ailments

Campbell suffered were apparently based largely on her subjective recollection and not on clinical documentation (Tr. 15).

First, the ALJ discounted Campbell's statements of disability during the time in question because she worked three (3) hours one day a week from 1984-85 and one and a half hour (1 ½) one day a week from 1986-88, and because she traveled to Utah (2001), Spain (1999) and Zurich( 1998). However, "substantial gainful activity means performance of substantial services with reasonable regularity, either in competitive or self employment." *Markham v. Califano*, 601 F.2d 533, 534 (10th Cir. 1979). And, "ability to drive an automobile, participate in some community affairs, . . . or to do some work on an intermittent basis does not necessarily establish that a person is able to engage in a 'substantial gainful activity'. . . ." *Id.*, *see also Broadbemt v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983)(sporadic diversions do not establish that a person is able to engage in substantial gainful activity). In this case, the fact that Campbell attempted to continue working even three hours a week does not support a finding that she retained the RFC to engage in sedentary level work during the time period in question. In fact, the record indicates Campbell had to decrease her time teaching in half due to her impairments. The ability to travel to Utah, Spain, and Zurich also does not support the ALJ's RFC determination.

Second, the ALJ found Campbell not disabled during the time in question because Dr. Sollins "did not speculate on exactly when she may have become severely impaired by her condition." Yet, the ALJ felt competent to speculate that Campbell was not severely impaired during the time in question. Additionally, the ALJ discounted the physicians' "references" to Campbell's impairments because they "were apparently based largely on her subjective recollection and not on clinical documentation." Tr. 18. However, at the time Campbell was

9

experiencing health problems, there was no "dipstick" test to diagnose her condition. Therefore, in this case, the lack of clinical documentation was an improper basis for discounting Campbell's physicians' references to her impairments. *See e.g.*, *Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 743-44 (holding the ALJ improperly impeached a claimant's unrebutted testimony because of the lack of a conclusive "dipstick" laboratory test for chronic fatigue syndrome); *Schwarz v. Barnhart*, 70 Fed.Appx 512, 518 (10th Cir. July 16, 1003); *Pennington v. Chater*, No. 96-5177, 1997 WL 297684, at *3 (10th Cir. June 5, 1997)("We are aware of no medical procedures to objectively evaluate either the severity of a migraine or pain; and where no such conclusive tests exist, the failure to produce such test results is surely an improper basis for discrediting a claimant's uncontroverted testimony."). Accordingly, in attending to her health care needs, physicians have had to rely on Campbell's subjective reports and her recollection of past events. Moreover, the Court is not aware of any clinician who does not rely on a patient's subjective reports in providing the patient health care services.

The ALJ also found Campbell not totally credible, stating: "Further, Ms. Campbell's activities subsequent to her alleged date of onset belie the total inability to do work that the claimant has asserted. Inconsistencies in the claimant's submitted documentation do not lend themselves to a great deal of credibility." Tr. 16. The ALJ cited, *inter alia,* to a December 15, 2000 letter Campbell attached to her request for reconsideration to support his credibility and RFC determination. The ALJ found:

> The claimant wrote and attached a letter to her request for reconsideration, received to the file on December 15, 2000 (Exhibit Section B). In her letter, Ms. Campbell wrote that she had become increasingly disabled beginning in November 1977. Her disabling impairments had become so severe that, 'at the present time I am unable to work . . ..' The letter was received in December 2000, yet the claimant alleged disability beginning November 30, 1978, one year after her alleged onset. This represents an unresolved

10

> inconsistency in the claimant's claim. The claimant's letter asserts that her condition began in November 1977 and it progressively reduced her ability to do work until she was unable to work as of December 2000, 23 years later. It stands to reason, then, that at the time she was last insured for Title II benefits in December 1984, only 7 years after the onset of her condition, Ms. Campbell could do some work at that date.

Tr. 16. However, in the same letter, Campbell wrote:

> During the time frame from November 1977 to December 1984 I was becoming increasingly symptomatic with my disability. I was becoming very psychologically distressed as I increasingly became less able to work part-time and less able to perform routine functions/activities. Also it was extremely distressing when the medical professionals I consulted with could not identify the reason for my increasing disability. However, during this same time frame there were several persons who were aware of my increasing problems relating to my disability and my increasing inability to work (even part-time) and especially to even participate in routine social activities. These persons can well attest to my disability during the November 1977 to December 1984 time frame.

Tr. 47. These statements corroborate Campbell's claim of disability during the time period in question and do not support the ALJ's finding that the statements he relied upon represent "an unresolved inconsistency" in her claim. The ALJ may not pick and choose particular entries in the record to support his ruling; he must consider the record as a whole. *Schwarz v. Barnhart*, 70 Fed.Appx. 512, 518 (10th Cir. July 16, 2003). The letter also does not support the ALJ's statement that, "The claimant's letter asserts that the condition began in November 1977 and it progressively reduced her ability to do work until she was unable to work as of December 2000, 23 years later." Tr. 16. In reality, Campbell wrote "I have become increasingly disabled beginning in November of 1997 until at the present I am unable to work because of fatigue, muscle myopathy . . . ." Tr. 41. This being so, it follows, *a fortiori*, that the ALJ's inference, based on this statement, that Campbell was able to work as of December 1984, "only 7 years after the onset of her condition," must fail.

Campbell's letters of verification of her employment also do not weigh against her credibility and corroborate her claim of disability.  Ms. Maria Pirret submitted a letter on Campbell's behalf stating, in pertinent part:

> I became acquainted with Irina in 1970 when she obtained employment as a secretary at the International Monetary Fund where I also worked at the time.  I was aware that during the time of her employment with the Fund Irina had health difficulties manifesting in frequent and severe respiratory infections.  This problem progressed becoming worse during 1977, and toward the end of that year Irina became ill and was unable to recuperate and return to work.

Tr. 180.  This letter supports Campbell's disability claim.  However, the ALJ does not refer to Ms. Pirret's letter in his decision.

Adelina P. Callahan submitted a letter stating Campbell had been employed at her restaurant **"periodically** from 1972 through the early eighties, when it became evident that she was not able to perform as part of the flamenco entertainment in the restaurant."  Tr. 181 (emphasis added).  Ms. Callahan further stated, "Unfortunately Irina was **unable to perform with consistency**, and after a few years had to forego her dancing because of her poor health."  *Id.* (emphasis added).  The ALJ relied on **part** of Ms. Callahan's letter in his RFC determination, finding she had the RFC for sedentary exertional level work through her date last insured.  Tr. 18. However, "periodically" and "unable to perform with consistency" do not support the ALJ's RFC determination.

The ALJ also cited to **part** of Ms. Joanne Stefanick's letter to support his RFC determination.  Ms. Stefancik's letter read in its entirety does not support a finding that Campbell retained the RFC for sedentary work during the period in question.  The ALJ relied on the following statement for his RFC determination: "Eventually, her muscle spasms became so bad she could not teach the dance classes she had been teaching . . . She asked me to take over her

classes in 1988." *Id.* Because Campbell was "working" in 1988, the ALJ concluded she could not be disabled in 1984. However, In her application for disability, Campbell noted that she had attempted part-time work after she resigned her job as a bilingual secretary. However, as previously noted, Campbell's part-time employment consisted of three (3) hours once a week and later one and a half (1 ½) once a week.

Campbell's former spouse also submitted a fifteen (15) page statement. Tr. 163-177. The ALJ reviewed this statement and noted "claimant's former husband, Gerald L. Campbell, also verified her dance instruction and work activity in his letter dated August 5, 2001."
Tr. 17. However, Mr. Campbell also wrote:

> During the latter part of 1977 Irina has a history of pneumonia and respiratory infections. Irina was experiencing increasingly frequent and severe respiratory infections. These were so exhaustive and weakening that she required almost continuous rest. During this time frame she went to several doctors but only received an occasional series of antibiotics.
> \* \* \* \* \* \*
> During the time-frame of about February of 1979, after an extended period of rest and with no other activities she continued to experience extreme fatigue. Irina was able to attend a once a week Bible-class, attend a once-a-week flamenco dance class and attend church on Sundays. This was the full extent of Irina's activities each week. During this time she was extremely limited in such routine activities as cooking, shopping for groceries, etc., and required extensive rest.
> \* \* \* \* \* \*
> During the period 1978-1981 Irina continued . . . to experience the problems of low immune function, repeated and severe respiratory infections and severe fatigue despite thyroid replacement. During this time period, Irina was hoping to get well (after resigning her job in 1977 because of illness) and obtain another job. To this end, in 1980 she applied for part-time work with a travel agency in Arlington, Virginia. Her intent was to work 4 hours a day- 5 days a week. After one week she realized she was too fatigued to do that. At that point, the travel agency agreed to let her work reduced hours at 4 hours-3 days a week. After about 2 months, Irina realized her fatigue level was too incapacitating to continue and it was necessary to resign.
> Irina continued to experience very low immune defenses with increasing frequent (sic) and severe respiratory infections. By the summer of 1980 she developed 'night sweat.' The night sweats were severe occurring several times each night, causing severe fatigue, loss of sleep and weakness. The night sweats continued with increasingly severe bronchial infections. Also during this period of time Irina started to experience traces of blood in her coughed-up sputum. Tuberculosis tests were done at several times but these were

> negative.  The sever fatigue, night sweats and frequent severe respiratory infections
> continued.  In 1982 Irina sought additional medical help from Dr. Florencio Bello in
> Richville Maryland.
>
> \* \* \* \* \* \*
>
> Also, during this period of time, Irina began to experience severe muscle spasms in her
> lower back after viral infections.  Usually the pattern would be that as son as she felt good
> enough to get out of bed, the first thing that would happen is that she would experience
> severe muscle spasms in her lower back.  These would be so disabling that it would be
> about 2 weeks before she could do anything at all.  This became a repetitive pattern.
>
> \* \* \* \* \* \*
>
> By 1983, Irina was able to participate in programs presenting Spanish dance in elementary
> schools.  This participation was extremely limited however.  The school shows were
> limited in number (for the most part usually less than one per week).  Additionally, Irina's
> participation was extremely limited.  She would normally provide a verbal presentation
> and would demonstrate a few dance steps usually for a duration of 2-3 minutes.

Tr. 163-170.  The Court has extensively cited Mr. Campbell's statement because he has been with Campbell throughout her ordeal with her medical problems and continues to reside with her. Moreover, other than Campbell and her treating physician during the period in question, he is in the best position to present her condition during the time period in question.  Mr. Campbell's statement also does not support the ALJ's RFC determination.

On October 3, 2002, Dr. Jerry Earl, Professor of Medicine at Georgetown University Hospital, wrote the Appeals Council on behalf of Campbell.  Pl.'s Mem. in Supp. of Mot. to Remand, Ex. A.  Dr. Earl mailed the letter directly to the Appeals Council.  However, the Appeals Council did not timely receive it.  Dr. Earl stated in his letter:

> I am pleased to take this time to write a letter describing the medical condition of Irina
> Campbell from the time I followed her while I was her attending physician at Georgetown
> University Hospital.  That was over a decade ago and the records from that period have
> not been recovered for my review.  I first met Irina and her husband, Gerald, in the early
> 1980's, probably 1980-81.  I served as her attending physician probably until the summer
> of 1988.  She had a very difficult and frustrating problem, which was chronic and
> disturbingly symptomatic and impaired her activities and function.  Symptoms includes
> weakness, lower back pain, muscle spasms, and increasingly poor stamina to sustain any
> activity.  She had unusually profound fatigue with the slightest efforts and still in
> appearance muscle mass contour and strength seemed at the lower end of normal for a lady
> of her age who could not be very active.  There was concern that her immune system was

> impaired since she had many viral and even bacterial infections.  We were stretching for explanations and used the more common one that we knew about that stress from her other condition which was causing the weakness, muscle spasms and exhaustion might be suppressing her own immune system.  She had difficulty finding a doctor because such symptoms are not easy to treat.
>
> \* \* \* \* \* \* \*
>
> Regardless of the fact that we did not know what the etiology was, I would have little doubt that she was incapacitated and would be unable to find employment she could maintain.  She was unable to complete even usual household maintenance functions during this time.

Pl.'s Mem. in Supp. of Mot. to Remand, Ex. A.  The Commissioner contends Campbell failed to establish good cause for her failure to submit the report during the administrative proceeding. In this case, Campbell must establish disability dating to 1978.  Dr. Earl's letter is material to the issue of disability.  The Court has considered Campbell's difficult task of proving her disability because of the time that has elapsed.  And, although untimely, Dr. Earl considered it important to take the time to submit his letter.  Based on the facts of this case, the Court will allow Dr. Earl's letter.  However, because the ALJ did not have Dr. Earl's letter before him, the Court will remand the case to allow the ALJ to consider it.

**<u>Conclusion</u>**

Based on the record as a whole, the Court finds the ALJ's RFC determination and his finding that Campbell could perform her past relevant work are not supported by substantial evidence.  The ALJ's finding that Campbell is not disabled is not supported by substantial evidence and is contrary to law. The Court will remand this case to allow the ALJ to reassess Campbell's RFC.  In doing so, the ALJ should apply Social Security Ruling 96-8p (Assessing Residual Functional Capacity in Initial Claims), not mischaracterize the evidence, consider Dr.

Earl's opinion as a treating source, and consult with a medical expert if necessary to assist him in his RFC determination.

      A judgment in accordance with this Memorandum Opinion and Order will be entered.

 

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**